## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| ANDY JARDINAS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | 18CV |
| The CITY OF CHICAGO, ILLINOIS, and | ) | |
| CHICAGO POLICE OFFICERS | ) | Judge |
| Rodrigo CORONA, Star No. 7852 | ) | |
| Manuel ARROYO, Star No. 5780 | ) | Magistrate Judge |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AT LAW

Plaintiff, ANDY JARDINAS, by and through his attorneys, Jeffrey B. Granich and Torreya L. Hamilton, makes the following complaint against Defendants The CITY OF CHICAGO, ILLINOIS, ("Defendant City"), and Chicago Police Officers Rodrigo CORONA, Star No. 7852, and Manuel ARROYO, Star No. 5780 ("Defendant Officers"):

### JURISDICTION and VENUE

1. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution.

2. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331 and 1343.

3. Venue is proper under 28 U.S.C. § 1391(b). All parties reside in this judicial district and the events giving rise to the claims asserted in this complaint occurred within this district.

### PARTIES

4. At all times relevant hereto, Plaintiff ANDY JARDINAS ("Plaintiff") was a 23 year old Hispanic male resident of Chicago, Illinois.

5.   At all times relevant hereto, Defendant Officers CORONA and ARROYO were Police Officers for the City of Chicago and were acting under the color of the law and within the scope of their employment.

6.   Defendant CITY OF CHICAGO is a municipal corporation, duly incorporated under the laws of the State of Illinois, and is the employer and principal of the Defendant Officers.

## FACTUAL ALLEGATIONS

### Defendant Corona's Use of Excessive Force On Plaintiff Causes a Brain Bleed.

7.   On November 5, 2016, Defendant Officers arrested Plaintiff for a misdemeanor charge of criminal damage to property.

8.   Following his arrest, Defendant Officers transported Plaintiff to the Chicago Police Department's 9th District police station, located at 3120 S. Halsted Street.

9.   After arriving at the 9th District police station, Defendant CORONA escorted Plaintiff, in handcuffs, to the arrestee processing room and placed Plaintiff inside a processing cell alone.

10.   Defendant CORONA did not remove Plaintiff's handcuffs prior to placing him inside a cell.

11.   Not long after Plaintiff was placed in a cell, Defendant CORONA returned to the cell, unlocked the door, and violently and intentionally used both of his hands to shove Plaintiff.

12.   When CORONA pushed Plaintiff, Plaintiff was still handcuffed.

13.   When CORONA pushed Plaintiff, Plaintiff only weighed 115 pounds.

14.   The amount of force used by Defendant CORONA caused Plaintiff to fall backwards and strike his head on the hard cell floor, ultimately causing a subdural hematoma and a brain bleed.

15.   Defendant CORONA's unreasonable use of force against Plaintiff was captured on video in the 9th District Police Station.

16.   Upon information and belief, Defendant's CORONA's unreasonable use of force against Plaintiff was also captured on Defendant CORONA's body camera video.

17. At the time Defendant CORONA used force against Plaintiff, Officer CORONA knew Plaintiff was not posing any threat that justified the force CORONA used on Plaintiff.

18. At the time Defendant CORONA used force against Plaintiff, Defendant CORONA knew that Plaintiff's hands were restrained in handcuffs and that Plaintiff would not have the ability to brace or protect himself from a fall.

19. Despite this knowledge, Defendant CORONA intentionally and violently used unreasonable force against Plaintiff significant enough to ensure that Plaintiff would lose his balance and cause Plaintiff's head to strike the floor unprotected, and with significant force.

20. At the time Defendant CORONA used force against Plaintiff, Defendant ARROYO was standing directly behind Defendant CORONA, but did nothing to prevent Defendant CORONA's unreasonable attack on Plaintiff.

21. Prior to and following Defendant CORONA's unreasonable use of force against Plaintiff, Defendant Officers agreed and conspired to make false statements and make false claims in official police documents in an attempt to cover up CORONA's excessive and unjustified use of force.

22. As a direct and proximate result of Defendant's actions, Plaintiff sustained severe and life threating injuries and he was transported to a Chicago hospital.

23. As a direct and proximate result of Defendant's actions, Plaintiff suffered serious head and brain injuries, including an intracranial hemorrhage and subdural hematoma.

24. As a direct and proximate result of Defendants actions, Plaintiff suffered physical pain, suffering, and emotional distress that continues to this day.

**Defendant Officers Corona's Known History of Police Misconduct.**

25. On and prior to November 5, 2016, and at all relevant times herein, Defendant OFFICER CORONA, was employed by Defendant, CITY OF CHICAGO, as a police officer with the Chicago Police Department.

26. On and prior to November 5, 2016, and at all relevant times herein, the Defendant CITY OF CHICAGO was aware that Defendant CORONA had an extensive history of violent and disturbing behavior against civilians within the City of Chicago.

27. Upon information and belief, Defendant CORONA, while on-duty as a Chicago Police Officer, has been involved in at least three separate incidents where three individuals died during either his pursuit, arrest, restraint, and/or detention of them.

28. On and prior to November 5, 2016, and at all relevant times herein, Defendant CITY OF CHICAGO was aware that Defendant CORONA, had an unreasonably long list of serious complaint registers ("CR") filed against him alleging misconduct and violence against civilians, including but not limited to the following CR files:

a.   On July 20, 2015, CR # 1076214 was filed against CORONA for excessive force and other misconduct resulting in the death of an arrestee Heriberto Godinez, Jr. Defendant Corona in this incident is scene on camera using his foot on the face of Heriberto Godinez, Jr. while Mr. Godinez is secured in handcuffs.

b.   On December 13, 2012, CR #1058985 was filed against CORONA and ARROYO for excessive force and/or other misconduct regarding his interaction with a civilian on December 12, 2012.

c.   On January 10, 2012, CR #1051167 was filed against CORONA for excessive use of force and/or other misconduct regarding his interaction with a civilian on August 6, 2010.

d.  On September 14, 2011, CR #1048530 was filed against CORONA and ARROYO regarding an allegation of an illegal search of a civilian.

e.  On May 14, 2010, CR #1036268 was filed against CORONA for inadequate/failure to provide services and/or other misconduct.

f.  On February 3, 2010, CR #1033630 was filed against CORONA for a complaint of misconduct against a civilian on January 6, 2008.

g.  On July 25, 2014, CR #1028538 was filed against CORONA in relation to his actions in a police chase vehicle pursuit which resulted in a traffic accident and a civilian's death.

h.  On July 13, 2009, CR #1028142 was filed against CORONA for false arrest and/or other police misconduct regarding his arrest of a civilian on July 13, 2009.

i.  On July 14, 2009, CR #1027300 was filed against CORONA for excessive force and/or other police misconduct regarding his interaction with a civilian on April 12, 2010.

j.  On June 27, 2008, CR #1017739 was filed against CORONA for failing to provide services to a civilian on June 26, 2008.

k.  On November 13, 2007, CR #1010885 was filed against CORONA for excessive and/or other police misconduct regarding his interaction with a civilian on September 23, 2007.

l.  On October 23, 2007, CR #1010360 was filed against CORONA for police misconduct in relation to his interaction with a civilian on October 22, 2007.

m.  On October 23, 2007, CR #1010366 was filed against CORONA for an illegal search regarding his interaction with a civilian on October 23, 2007.

n.  On March 4, 2007, CR #1003837 was filed against CORONA for an illegal search and/or other police misconduct regarding his interaction with a civilian on March 3, 2007.

29. Upon information and belief, since Defendant CORONA became a police officer in 2006 he has amassed over 20 CR investigations, a majority of which were registered for violent or

unconstitutional behavior, yet the CITY OF CHICAGO did nothing to intervene and stop

CORONA's violent, aggressive, and unconstitutional behavior before he harmed Plaintiff.

Instead, Defendant CITY OF CHICAGO has turned a blind eye to CORONA's misconduct

and failed to implement any reasonable intervention, discipline, retraining, or separation to stop

or halt his violent propensities and protect civilians of Chicago, like Plaintiff, from CORONA's

violence.

30. Prior to and on November 5, 2016, the Defendant CITY OF CHICAGO was aware that

Officer CORONA had been named as a Defendant in at least six federal or state court civil

rights cases that alleged that CORONA committed excessive force, false arrest, or other police

misconduct against a plaintiff.

   a. *Bright v Corona, et al.*, 07 CV 7197
   b. *Cornell Sims v. Saldana, et al.*, 09 CV 6647
   c. *McCoy v. Corona, et al.*, 11 CV 7960;
   d. *Cross v City of Chicago, et al.*, 2010 L 010769
   e. *Smith, et al., v. City of Chicago, et al.*, 14 CV 4359
   f. *Godinez v. City of Chicago, et al.*, 16 CV 7344

31. Prior to and on November 5, 2016, despite the Defendant CITY OF CHICAGO having clear

and obvious knowledge of the dangerous and violent propensities of Defendant Officer

CORONA, Defendant CITY OF CHICAGO continued to retain CORONA as a Chicago

Police Officer and dispatched him onto the streets of Chicago to interact with civilians under the

color of law as Chicago police officers.

32. Prior to and on November 5, 2016, Defendant CITY OF CHICAGO instilled in Defendant

Officer CORONA and ARROYO a mindset of impunity that was emboldened through the

Code of Silence and the Defendant CITY OF CHICAGO's repeated failures to maintain an

adequate Early Warning System, and investigate and discipline Defendant Officers CORONA

and ARROYO during their time with the Chicago Police Department.

**The City of Chicago's history of covering up and condoning**
**police misconduct to protect and shield its dangerous officers.**

33. Along with Officer Corona, the Chicago City Council has long been aware of the regulatory, supervisory and disciplinary failures plaguing the Chicago Police Department.

34. At an October 2007 meeting of the Council's Committee on the Budget and Government Operations, a Council member remarked of the OPS that "there is no follow-up [of citizen complaints], and I think we have to move beyond the code of silence and the protection of the police officers and command staff at any cost."

35. In 2007, off-duty Chicago police officer Anthony Abbate ruthlessly beat a bartender, Karolina Obrycka, at her place of employment. Following the incident, officers conspired to keep Abbate's name from the police documents and reports and attempted to intimidate the victim from pursuing her claims. The incident was caught on video tape, the case proceeded to trial, and the jury found against the City of Chicago.

36. Following the Obrycka incident in 2007, the City Council replaced OPS with IPRA, primarily in response to concerns and complaints about how allegations of police misconduct were being investigated.

37. However, IPRA used the OPS manual as its own operational manual, retained the vast majority of its staff from OPS, and, for all intents and purposes, was a continuation of the failed OPS system that had been in place.

38. Chicago Mayor Rahm Emanuel delivered a speech to the City Council in which he admitted that a code of silence exists and has existed within the Chicago Police Department, stating: "This problem is sometimes referred to as the Thin Blue Line. Other times it is referred to as the code of silence. It is the tendency to ignore, deny, or in some cases cover-up the bad actions of a colleague or colleagues…*Permitting and protecting even the smallest acts of abuse by a tiny fraction of our officers leads to a culture where extreme acts of abuse are more likely*…"

39. The Mayor also admitted that "[s]upervision and leadership in the police department and the oversight agencies that were in place failed," and that "Our city has been down this road before." Mayor Emanuel also stated that he intended to create a task force to examine these failures within IPRA that would reach back to at least 2007.

40. In April 2016, the Mayor's "Police Accountability Task Force" supported the Mayor's statements that a code of silence or blue shield exists within the Chicago Police Department. (Police Accountability Task Force, at 69-70.)

41. Specifically, the Mayor's Task Force concluded, among other things:

a. The police cannot be held accountable for misconduct that is hidden. Yet there are many ways in which the current system serves to make it more difficult to identify potential misconduct. For years, people have talked about a "blue code of silence," an unwritten rule that says that a police officer will not report on another police officer's misdeeds.

b. In December 2015, Mayor Emanuel was asked if there is a "code of silence" that exists among Chicago police officers. "The short answer is yes," he said. Referring to the shooting death of Laquan McDonald, Mayor Emanuel conceded that "this isn't the first shooting where maybe there hasn't been honest reporting by officers who were there." As he then explained in a December 9, 2015 speech to the City Council:

*This problem is sometimes referred to as the Thin Blue Line. Other times it is referred to as the code of silence. It is the tendency to ignore, deny or in some cases cover-up the bad actions of a colleague or colleagues…We cannot ask citizens in crime-ravaged neighborhoods to break the code of silence if we continue to allow a code of silence to exist within our own police department.*

c. Current and former CPD officials have also increasingly acknowledged a "code of silence." Former Superintendent Richard Brzeczek (1980-83) has said that a code of silence "has always existed in the police department." Eugene Williams, the current Chief of the Bureau of Support Services, and former Chief of the Bureau of Patrol, stated that:

*[S]ix months of academy training cannot stand up to a career of "on the streets influence" by veteran officers who are all too anxious to show the rookies how things are really done on the streets. The way it is done on the streets is to protect and cover for your partner at all cost, even at the expense of sacrificing every ounce of one's integrity. This culture has been all too evident when we investigate thousands of allegations where the partner of the accused never sees, or hear[s] of any inappropriate conduct although they work in very close proximity of each other during their entire tour of duty. Yet, within this culture it is considered righteous to cut corners and embellish on the facts in a case report or arrest report to win a case in court.*

d. The code of silence is institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City. These impediments to identifying potential misconduct must be eliminated if CPD and the City are to end this persistent challenge.

(Police Accountability Task Force, at 69-70.)

42. The Chicago Police Department has a policy, pattern and practice of refusing to investigate civilian complaints filed against officers if the civilian does not file an affidavit.

43. The effect of such a policy is that a full *45 percent* of CRs registered against officers are never investigated.

44. Those officers with the highest numbers of CRs registered against them also had the highest rate of CR non-investigation for lack of an affidavit.

45. The Chicago Police Department has a history of failing to sustain CRs filed against officers-even officers with more than 5 CRs filed against them, like Defendant Officer Corona.

46. Additionally, the *Police Accountability Task Force Report 2016* identified that the Chicago Police Department has "no dedicated system [that] exists to identify and address patterns or practices…" and "[s]ince its inception, IPRA has had the power to examine patterns of complaints when investigating misconduct, but has not exercised it."

47. The United States Department of Justice (DOJ) made the following findings in its 2017 Report investigating the Chicago Police Department:

a. From 2011-2016 fewer than 2% of the 30,000 complaints of police misconduct were sustained, resulting in no discipline in 98% of the complaints.

b. The City does not investigate the majority of cases it is required by law to investigate.

c. Civilians, officer witnesses, and accused officers are frequently not interviewed during an investigation.

d. The questioning of officers is often cursory and aimed at eliciting favorable statements justifying the officer's actions rather than seeking truth.

e.  Investigative fact-finding into police misconduct and attempts to hold officers accountable are also frustrated by police officers' code of silence.

f.  The City, police officers, and leadership within the CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence.

g.  In the rare instance when complaints of misconduct are sustained, discipline is haphazard and unpredictable, and is meted out in a way that does little to deter misconduct.

h.  Officers are often disciplined for conduct far less serious than the conduct that prompted the investigation and even when a complaint is sustained, there is no discipline.

i.  Complaints that are investigated reveal consistent patterns of egregious investigative deficiencies that impede the search for the truth.

j.  Despite having the option to override a "No Affidavit" finding in an administrative investigation, the override provision was used only 17 times from 2011-2016.

k.  Superficial investigation documentation and investigative bias exists in favor of officers.

l.  Investigations into Rule 14, the CPD rule forbidding officers from lying during the course of an investigation, are not encouraged and had previously been prohibited unless given approval from the IPRA Chief Administrator.

48. This "Code or Silence" and/or "Blue Shield," wherein the City of Chicago covered up and condoned police misconduct to shield its officers- including dangerous officers that pose a threat to the public, such as Defendant Officer Corona- allowed these officers to act with impunity and feel as though their acts of misconduct would go uninvestigated, deficiently investigated, and/or undisciplined.

49. The City of Chicago participated in this Code of Silence when it failed to hold Defendant Officer Corona accountable for the unreasonable force he used against Plaintiff, despite having

video evidence of the abuse.

50. The City of Chicago participated in this Code of Silence when they attempted to hide or cover-up Defendant Officer Corona's role in the incident underlying Plaintiff's complaint.

51.  The City of Chicago participated in this Code of Silence when it consistently failed to train or retrain its high-complaint officers to prevent continued Department violations, constitutional violations, and/or harm to the public.

52. The City of Chicago participated in this Code of Silence when they failed to investigate numerous CR complaints filed against Defendant Officer Corona, due to the policy of refusing to investigate CRs unaccompanied by complainant affidavit.

53. The City of Chicago participated in this Code of Silence when they failed to take any action in response to a demonstrated pattern of violent and abusive behavior by Defendant Officer Corona, enabling him to hide for years behind the Blue Shield.

54. The effect of such policy is that officers, including- but not limited to- Defendant Officer Corona and Arroyo, feel they can act with impunity and without fear of reprimand.

55. In October 2017, in *First Midwest Bank v. City of Chicago*, a jury in the Northern District of Illinois found that Defendant City of Chicago maintained a widespread practice and/or custom of failing to investigate officer misconduct.

56. In October 2017, in *First Midwest Bank v. City of Chicago*, a jury in the Northern District of Illinois found that Defendant City of Chicago maintained a widespread practice and/or custom of failing to discipline officer misconduct.

57. The City of Chicago had and has no system in place that functions as an early warning system to find rehabilitate, discipline, or terminate officers with histories of misconduct.

58. The City of Chicago has no system in place that functions as an early warning system to find, rehabilitate, discipline, or terminate officers with histories of misconduct.

59. The City of Chicago's Behavioral Intervention System (BIS) and Personnel Concerns Program (PC) are non-disciplinary programs in nature.

60. The City of Chicago's Behavioral Intervention System (BIS) and Personnel Concerns Program (PC) exist in name only.

61. The BIS and PC systems are flawed in that reforms over the years have been allowed to "wither on the vine."

62. Reforms in the BIS and PC systems have been met with virulent opposition from the Fraternal Order of Police.

63. The effects of this opposition and concessions by the Chicago Police Department can be seen in the rapid decline of the number of officers enrolled in its BIS and PC programs from 2007 until prior to the incident underlying Plaintiff's complaint.

64. The DOJ found in its 2017 Report that, "The lack of a functioning early intervention system, coupled with inadequate supervision, has placed officers and members of the public at risk."

65. The DOJ also found that the, "CPD does not adequately and accurately identify officers who are in need of corrective action; and second, CPD does not consistently or sufficiently address officer behavior even where CPD identifies negative patterns."

66. As a result of these failures, "CPD officers are able to engage in problematic behaviors with impunity, which can—and do—escalate into serious misconduct."

67. In October 2017, in *First Midwest Bank v. City of Chicago*, a jury in the Northern District of Illinois found that Defendant City of Chicago maintained a widespread practice and/or custom of failing to maintain an adequate early warning system.

**Count I – 42 U.S.C. § 1983 – Excessive Force**

68. Each paragraph of this Complaint is incorporated as if restated fully herein.

69. On November 5, 2016, Defendant Officer CORONA subjected Plaintiff to excessive force in violation of the Fourth Amendment to the United States' Constitution.

70. The misconduct as described in the preceding paragraphs was objectively unreasonable.

71. As a result of the unjustified and excessive use of force, Plaintiff suffered severe injuries, as well as pain, suffering, and emotional distress.

   **WHEREFORE**, Plaintiff prays for judgment against Defendants in a fair and just amount sufficient to compensate him for the injuries he suffered, plus, Plaintiff seeks a substantial sum in punitive damages against Defendant Officer CORONA, costs and reasonable attorney fees, and all such other relief as this Court finds just and equitable.

## Count II – 42 U.S.C. § 1983 – Failure to Intervene

72. Plaintiff re-alleges the preceding paragraphs as if fully replead herein.

73. During the constitutional violations as described above, Defendant Officer ARROYO had a reasonable opportunity to intervene to prevent CORONA's misconduct towards Plaintiff and to prevent the harm Plaintiff has suffered, but ARROYO failed to intervene.

74. The misconduct described in this Count was objectively unreasonable.

75. As a result of this failure to intervene to prevent the violation of Plaintiff's Constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. Officer ARROYO had a reasonable opportunity to prevent this harm, but failed to do so.

   **WHEREFORE**, Plaintiff prays for judgment against Defendant Officers in a fair and just amount sufficient to compensate her for the injuries she suffered and continue to suffer, plus, Plaintiff seeks a substantial sum in punitive damages against Defendants, costs and reasonable attorney fees, and all such other relief as this Court finds just and equitable.

## Count III – 42 U.S.C. § 1983 Conspiracy

76. Each paragraph of this Complaint is incorporated as if restated fully herein.

77. Defendants reached an agreement among themselves to deprive Plaintiff of his constitutional rights as set forth in the various paragraphs of the Complaint.

78. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in this joint activity, including making false statements about the incident for the purpose of covering up Officer CORONA's use of excessive force.

79. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

80. As a direct and proximate result of the illicit prior agreement to use unreasonable and excessive force against Plaintiff and the Defendant Officers agreement and overt acts in attempting to cover up Officer CORONA's use of excessive force, Plaintiff's rights were violated, and he suffered injuries, including physical pain, suffering, and emotional distress.

   **WHEREFORE**, Plaintiff prays for judgment against Defendants in a fair and just amount sufficient to compensate him for the injuries he suffered and continues to suffer, plus, Plaintiff seeks a substantial sum in punitive damages against Defendant Officers, costs, and reasonable attorney fees, and all such other relief as this Court finds just and equitable.

### Count IV – *Monell* Claim
(Code of Silence)

81. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

82. At all relevant times, Plaintiff had a constitutional right to be free from excessive force under the Fourth Amendment to the United States Constitution, incorporated to apply to the states through the Fourteenth Amendment to the United States Constitution.

83. Plaintiff's constitutional right to be free from excessive force was violated on November 5, 2016, when he was violently shoved by Defendant CORONA while in handcuffs causing him to fall backwards onto the ground sticking his head.

84. Plaintiff's constitutional right to be free from excessive force was violated by Defendant Officer

CORONA, who was a Chicago police officers acting under color of state law.

85. The actions of Defendant, CITY OF CHICAGO, and Defendant Officer CORONA were done pursuant to *de facto* policies, practices and/or customs of the CITY OF CHICAGO that are so pervasive that they carry the force of law.

86. The CITY of CHICAGO has a *de facto* policy, practice and/or custom of maintaining a Code of Silence.

87. The Code of Silence is an implicit understanding between and among members of the CPD resulting in a refusal or failure to report instances of misconduct of which they are aware, including the use of unlawful force, despite their obligation to do so as sworn peace officers. This includes police officers who remain silent or give false or misleading information during official investigations into allegations of a fellow officer related to misconduct that occurred on duty or off duty in order to protect themselves or their fellow officers from discipline, criminal prosecution or civil liability.

88. This *de facto* policy, practice, and/or custom involves concealing and/or suppressing officer misconduct (both on duty and off-duty misconduct), including the use of unlawful force. The concealment and suppression of the existence of misconduct includes, but is not limited to: failure to sufficiently investigate allegations of misconduct; failure to accept complaints from citizens against police officers; the failure to investigate criminal conduct where off or on duty officers are involved**;** the disparate treatment of an officer who is the subject of an investigation and a non-officer suspect**;** failure to promptly record witness statements or preserve evidence; failure to promptly interview the suspected officer; failure to properly and sufficiently discipline an officer, even where the complaint is sustained; fabrication of exculpatory evidence or destruction of evidence; and failure to initiate prompt disciplinary procedures related to the alleged misconduct, even when the allegation of misconduct has obvious merit.

89. This *de facto* policy, practice and/or custom also includes defective and biased procedures for investigating complaints, including excessive force and domestic violence complaints, against on and off-duty officers. This "double standard" regarding allegations of misconduct against officers includes, but is not limited to: all of the above acts and/or omissions listed in the paragraph above; limiting charges against off-duty officers to misdemeanors (or taking measures to have the charges dismissed), regardless of the severity or outrageousness of the alleged misconduct; and suppressing felony review of charges against off-duty officers, regardless of the severity or outrageousness of the alleged misconduct.

90. This *de facto* policy, practice and/or custom also includes failing to maintain accurate and complete records of complaints and investigations of misconduct.

91. This *de facto* policy, practice and/or custom also includes failing to turn over and disclose complete records of complaints and investigations of misconduct.

92. Further, the City of Chicago acted in a manner consistent with a *de facto* policy, practice and/or custom of a "code of silence" and "blue shield" when it engaged in conduct such as, but not limited to, the following:

   a. The City of Chicago, IPRA/COPA and its supervisors failed to conduct proper administrative investigations into the complaints against department member (CRs) filed against CORONA before the injuries caused to Plaintiff underlying this Complaint.

   b. The City of Chicago, IPRA/COPA and its supervisors failed to lawfully and/or properly adjudicate the administrative investigations into the complaints against department member (CRs) filed against CORONA before the injuries caused to Plaintiff underlying this Complaint.

   c. The City of Chicago failed to properly discipline and/or discipline Defendant CORONA prior to November 5, 2016

d.  The City of Chicago failed to separate Defendant Officer CORONA from the CPD for his violent/forceful history predating November 5, 2016.

e.  The City of Chicago failed to discipline Officer CORONA for the unreasonable use of force he administered on Plaintiff despite the video evidence.

f.  The City of Chicago failed to discipline Officer ARROYO for making false and misleading statements regarding this incident in order to cover up Officer CORONA's unreasonable use of force.

g.  The City of Chicago failing to discipline Officer CORONA for making false or misleading statements to investigators relating to other civilian complaints against him alleging excessive force and/or other misconduct.

93. The above described *de facto* policies, practices and/or customs of the CITY OF CHICAGO in maintaining a Code of Silence proximately resulted in the culture and endemic attitude among members of the CPD, including Defendant Officer CORONA and Defendant Officer ARROYO, that they may engage in misconduct against citizens of Chicago with impunity, and without fear of official consequence; they consider themselves "above the law."

94. The aforementioned *de facto* policies, practices and/or customs of the CITY OF CHICAGO, has been maintained and/or implemented with utter indifference by Defendant CITY of CHICAGO and has or have encouraged and/or motivated Defendant Officer CORONA and Defendant Officer ARROYO to commit the aforesaid wrongful acts against Plaintiff, and therefore were the direct and proximate cause of the injuries sustained by him.

95. The aforementioned *de facto* policies, practices and/or customs of the CITY OF CHICAGO, were the moving force behind CORONA's conduct, depriving Andy Jardinas of his Fourth Amendment right to be free from excessive force.

96. The aforementioned *de facto* policies, practices and/or customs of the CITY OF CHICAGO, were the moving force behind ARROYO's conduct, depriving Andy Jardinas of his Fourth Amendment right to be free from excessive force.

97. The above acts and/or omissions of the CITY of CHICAGO violated the rights of Plaintiff under the Fourth and Fourteenth Amendments to the United States Constitution.

98. As a direct and proximate result of the above acts and/or omissions of the CITY of CHICAGO, Plaintiff suffered severe injuries, pain, suffering, and emotional distress which continue to this day.

**WHEREFORE**, Plaintiff prays for judgment against Defendant, CITY OF CHICAGO, in a fair and just amount sufficient to compensate him for the injuries he suffered and continues to suffer, plus, Plaintiff seeks costs, reasonable attorney fees, and all such other relief as this Court finds just and equitable.

## COUNT V – *Monell* Claim
### (Failure to Investigate Officer Misconduct)

99. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

100. The actions of Defendant, CITY OF CHICAGO, and Defendant CORONA and ARROYO were done pursuant to one or more of the following *de facto* policies, practices and/or customs of the CITY OF CHICAGO that are so pervasive that they carry the force of law.

101. The City of Chicago, including but not limited to CPD, OPS, IAD, IPRA, and/or COPA has a policy, pattern and practice of failing to investigate complaints filed against officers registered by citizens if the citizen complainant does not file an affidavit, despite there being exceptions to the proceeding with an investigation without an affidavit.

102. As a result, approximately 45 percent of CRs registered against officers are never investigated.

103. Officers with the highest number of CRs also had the highest rate of CRs filed unaccompanied by an affidavit. As a result, high-CR officers go disproportionately uninvestigated for allegations of misconduct.

104. Of the over 20 CRs filed against Defendant Officer CORONA, an unreasonable amount were not properly investigated due to the affidavit policy.

105. By maintaining the policy of failing to investigate CRs that are not accompanied by an affidavit and without invoking any of the exceptions, the City of Chicago is concealing officer misconduct and ensuring the officers against whom CRs are registered will not face investigation or discipline, causing officers to feel they can act with impunity.

106. The aforementioned de facto practices, policies, and customs of Defendant, individually and collectively, have been maintained and/or implemented with utter indifference by Defendant, and have encouraged and/or motivated Defendant Officer CORONA and ARROYO to commit the aforesaid wrongful act against Plaintiff, and therefore acted as the direct and proximate causes of the injuries sustained by Plaintiff.

107. Individually and collectively, the above described *de facto* policies, practices and/or customs of the CITY OF CHICAGO proximately result in the culture and endemic attitude among members of the CPD, including Defendant Officers CORONA and ARROYO, that they may engage in misconduct against citizens of Chicago with impunity, and without fear of official consequence; they consider themselves "above the law."

108. The aforementioned *de facto* policies, practices and/or customs of the CITY OF CHICAGO, individually and collectively, have been maintained and/or implemented with utter indifference by Defendant CITY of CHICAGO and has or have encouraged and/or motivated Defendant Officer CORONA and ARROYO to commit the aforesaid wrongful

acts against Plaintiff and therefore were the direct and proximate cause of the injuries sustained by Plaintiff.

109.    The aforementioned *de facto* policies, practices and/or customs of the CITY OF CHICAGO, were the moving force behind CORONA's and ARROYO's conduct, depriving Plaintiff of his Fourth Amendment right to be free from excessive force.

110.    The above acts and/or omissions of the CITY of CHICAGO violated the Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

111.    As a direct and proximate result of the above acts and/or omissions of the CITY of CHICAGO, Plaintiff suffered severe injuries, pain, suffering, and emotional distress which continue to this day.

   **WHEREFORE**, Plaintiff prays for judgment against Defendant, CITY OF CHICAGO, in a fair and just amount sufficient to compensate him for the injuries he suffered and continues to suffer, plus, Plaintiff seeks costs, reasonable attorney fees, and all such other relief as this Court finds just and equitable.

### COUNT VI – *Monell* Claim
### (Failure to Discipline Officer Misconduct)

112.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

113.    The actions of Defendant, CITY OF CHICAGO, and Defendant Officers CORONA and ARROYO were done pursuant to one or more of the following *de facto* policies, practices and/or customs of the CITY OF CHICAGO that are so pervasive that they carry the force of law.

114.    The CITY OF CHICAGO has a *de facto* policy of failure to discipline officers under investigation for misconduct, even where the allegations against them have merit.

115.    The CITY OF CHICAGO knew or should have known it was actively concealing officer misconduct when it failed to adequately and promptly discipline or pursue a charge against

Defendant CORONA in 2015 when he used his foot on the face of Heriberto Godinez, Jr. while he was in handcuffs after Mr. Godinez later died while in police custody.

116. The City of Chicago knew or should have known it was actively concealing when it failed to discipline Defendant Officer CORONA for other excessive force complaints made against him.

117. Further, the City of Chicago has a *de facto* policy of failure to punish, suspend, re-train, terminate, or otherwise discipline officers with high numbers of CRs, resulting in disproportionately infrequent and light discipline against offending officers.

118. The aforementioned *de facto* practices, policies, and customs of Defendant, individually and collectively, have been maintained and/or implemented with utter indifference by Defendant, and have encouraged and/or motivated Defendant Officer CORONA and ARROYO to commit the aforesaid wrongful act against Plaintiff, and therefore acted as the direct and proximate causes to the injuries sustained by Plaintiff.

119. Individually and collectively, the above described *de facto* policies, practices and/or customs of the CITY OF CHICAGO proximately result in the culture and endemic attitude among members of the CPD, including Defendant Officers CORONA and ARROYO, that they may engage in misconduct against citizens of Chicago with impunity, and without fear of official consequence; they consider themselves "above the law."

120. The aforementioned *de facto* policies, practices and/or customs of the CITY OF CHICAGO, individually and collectively, have been maintained and/or implemented with utter indifference by Defendant CITY of CHICAGO and has or have encouraged and/or motivated Defendant Officers CORONA and ARROYO to commit the aforesaid wrongful acts against the Plaintiff, and therefore were the direct and proximate cause of the injuries sustained by Andy Jardinas.

121.     The aforementioned *de facto* policies, practices and/or customs of the CITY OF CHICAGO, were the moving force behind CORONA's and ARROYO's conduct, depriving Plaintiff of his Fourth Amendment right to be free from excessive force.

122.     The above acts and/or omissions of the CITY of CHICAGO violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

123.     As a direct and proximate result of the above acts and/or omissions of the CITY of CHICAGO, Plaintiff suffered severe injuries, pain, suffering, and emotional distress which continue to this day.

   **WHEREFORE**, Plaintiff prays for judgment against Defendant, CITY OF CHICAGO, in a fair and just amount sufficient to compensate him for the injuries he suffered and continues to suffer, plus, Plaintiff seeks costs, reasonable attorney fees, and all such other relief as this Court finds just and equitable.

### COUNT VII – *Monell* Claim
### (Failure to Maintain a Proper Early Warning System)

124.     Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

125.     The actions of Defendant, CITY OF CHICAGO, and Defendant Officer CORONA and ARROYO were done pursuant to one or more of the following *de facto* policies, practices and/or customs of the CITY OF CHICAGO that are so pervasive that they carry the force of law.

126.     The City of Chicago has failed to maintain a proper or valid early warning system to detect and intervene with corrective measures officers with multiple CRs and/or who exhibit patterns of potentially adverse performance, attitude and behavior.

127.     Defendant, CITY OF CHICAGO, failed to maintain and/or utilize a valid early warning system which would have identified Defendant Officer CORONA and/or ARROYO as an officer with repeated offenses alleged against him and led to the proper discipline, re-

training, supervising or other intervention into his behavior, therefore preventing the subject excessive for against Plaintiff to occur, even though Defendant CITY OF CHICAGO knew or should have known that its system did not work and/or was not proper and that the failure of such would cause and could cause injury to an individual such as Plaintiff.

128. Defendant, CITY OF CHICAGO, failed to identify the small fraction of officers with the highest numbers of CRs registered against them, despite knowing that such identification and proper retraining or discipline could prevent them from committing further acts that would cause and could cause injury to an individual such as Plaintiff.

129. Defendant, CITY OF CHICAGO, failed to identify the small fraction of officers with the highest number of CRs, despite knowing that such failure could cause those officers to feel they could act with impunity and without fear of retribution.

130. Defendant, CITY OF CHICAGO, failed to identify and/or failed to act on the fact that that Defendant Officer CORONA was in the top fraction of officers with the highest number of CRs, despite knowing that such identification and proper retraining or discipline could prevent them from committing further acts that would cause and could cause injury to an individual such as Plaintiff.

131. Defendant, CITY OF CHICAGO, failed to identify and/or failed to act on the fact that that Defendant Officer CORONA was in the top fraction of officers with the highest number of CRs, despite knowing that such failure could cause him to feel he could act with impunity and without fear of retribution.

132. Defendant, CITY OF CHICAGO, maintained and affirmed agreements with the Chicago Police Department which limited OPS's, IPRA's, and COPA's ability to utilize past complaints in its investigations, hampering their ability to identify patterns in officer

misconduct, despite knowing that such failure could prevent officers from committing further acts which would cause injury to individuals such as Plaintiff.

133. Individually and collectively, the above described *de facto* policies, practices and/or customs of the CITY OF CHICAGO proximately resulted in the culture and endemic attitude among members of the CPD, including Defendant Officer CORONA and ARROYO, that they may engage in misconduct against citizens of Chicago with impunity, and without fear of official consequence; they consider themselves "above the law."

134. The aforementioned *de facto* policies, practices and/or customs of the CITY OF CHICAGO, individually and collectively, have been maintained and/or implemented with utter indifference by Defendant CITY of CHICAGO and has or have encouraged and/or motivated Defendant CORONA and ARROYO to commit the aforesaid wrongful acts against the Plaintiff, and therefore were the direct and proximate cause of the injuries sustained by Andy Jardinas.

135. The aforementioned *de facto* policies, practices and/or customs of the CITY OF CHICAGO, were the moving force behind CORONA's and ARROYO's conduct, depriving Plaintiff of his Fourth Amendment right to be free from excessive force.

136. The above acts and/or omissions of the CITY of CHICAGO violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

137. As a direct and proximate result of the above acts and/or omissions of the CITY of CHICAGO, Plaintiff suffered severe injuries, pain, suffering, and emotional distress which continue to this day.

**WHEREFORE,** Plaintiff prays for judgment against Defendant, CITY OF CHICAGO, in a fair and just amount sufficient to compensate him for the injuries he suffered and continues to

suffer, plus, Plaintiff seeks costs, reasonable attorney fees, and all such other relief as this Court finds just and equitable.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

ANDY JARDINAS

By: /s Jeffrey B. Granich
    One of Plaintiffs' Attorneys

LAW OFFICE OF JEFFREY GRANICH
53 West Jackson Boulevard, Suite 1028
Chicago, Illinois 60604
312.939.9009
JeffreyGranich@gmail.com
Atty. No. 6297030

By: /s Torreya L. Hamilton
    One of Plaintiffs' Attorneys

HAMILTON LAW OFFICE, LLC
53 West Jackson Boulevard, Suite 452
Chicago, Illinois 60604
312.726.3173
tlh@thehamiltonlawoffice.com
Atty. No. 6229397